Argued and submitted March 5, reversed and remanded for further proceedings June 4, 2002

## Vincent DIMONE,
## Debra Dimone, and Edward Davis,
*Petitioners,*

*v.*

## CITY OF HILLSBORO
## and Zoe Anne Arrington,
*Respondents.*

## 2001-117, 2001-118; A116985

47 P3d 529

Michael J. Lilly argued the cause and filed the brief for petitioners Vincent Dimone and Debra Dimone.

Timothy S. "Todd" Sadlo argued the cause and filed the brief for petitioner Edward Davis.

Jack L. Orchard argued the cause for respondent Zoe Anne Arrington, and Timothy J. Sercombe argued the cause for respondent City of Hillsboro. With them on the brief were Kristin L. Udvari and Ball Janik LLP.

Before Haselton, Presiding Judge, and Deits, Chief Judge, and Wollheim, Judge.

DEITS, C. J.

## DEITS, C. J.

Petitioners seek judicial review of the Land Use Board of Appeals' (LUBA's) affirmance of an amendment by the City of Hillsboro to its zoning map designation for a newly annexed area. The city's decision, Ordinance No. 5040, applied a Station Community Commercial—Multi-Modal (SCC-MM) zoning designation to the property involved in this case, replacing the Washington County R-6 zone. We reverse and remand.

The basic facts are not in dispute. In 1994, the City of Hillsboro and Washington County began planning for development within a study area surrounding the Hillsboro extension of the Westside Light Rail Transit System and new light rail stations. The city and the county signed a memorandum of understanding (MOU) giving the city primary responsibility for planning within the city and in the unincorporated areas of the county generally within one-half mile of the light rail stations. It was understood that this area would eventually be annexed to the city. The subject property, belonging to respondent Zoe Anne Arrington, was outside the Hillsboro city limits but within the Quatama/185th Avenue Station Community Planning Area (SCPA) and within the area for which the MOU delegated planning responsibility to the city.

In August 1996, the city adopted Ordinance No. 4454, which identified the boundaries of the SCPA and amended the comprehensive plan designations for all properties within the area to Station Community Planning Area. As part of this process, 14 implementing SCPA zones were created to be applied to the property in the SCPA. The city adopted Ordinance No. 4545, approving recommended zoning designations for property within the SCPA, in April 1997. In that ordinance, the city council determined that the Arrington property should be zoned SCC-MM. The SCC-MM zone permits a variety of uses, including commercial, office, community service, and residential. The parties refer to the recommended zoning designation as a "shadow zone" because of the fact that, at the time the city adopted it, the property had not yet been annexed and, consequently, the city did not have authority to designate the zoning for this area.

Under the MOU, the county was to amend zoning designations for properties within the SCPA consistently with the city's adopted designations. In this case, the county did not make the change in zone to SCC-MM but left the property zoned R-6.[1] As a result, the Arrington property retained the county's R-6 residential designation when the city eventually annexed the property in November 2000. After annexation of the property subject to the MOU, the city sought to apply the SCPA zone that it had recommended in Ordinance No. 4545. The city's planning department requested that the Hillsboro Planning Commission approve a resolution to initiate a zone change from the county's R-6 zone to the city's SCC-MM zone. The planning commission initiated the zone change and referred the change request to the City Planning and Zoning Hearings Board (the PZHB).

After reviewing the request, the PZHB voted to deny the proposed change. The PZHB held that the proposal did not comply with Section 114(2)(b) of Hillsboro Zoning Ordinance No. 1945, which requires that, where a particular plan designation may be implemented by several possible zoning designations, the applicant must show that the proposed zone "is best suited for the site, based on specific policies of the Hillsboro Comprehensive Plan."[2] The PZHB also relied on its finding that the zone change would violate Hillsboro Comprehensive Plan Urbanization Policy, Implementation Measure A(5), in denying the zone change. That measure requires that "[a]ppropriate measures shall be taken to [e]nsure that new development in infill areas is compatible with existing developed areas." The PZHB's decision was also based on SCPA Policy VI, which provides that the city should work with the county to ensure that lands including the subject property "are planned for transit-oriented residential

---

[1] The parties do not explain why the county failed to make that change.

[2] Three zoning districts (out of the 14 zoning districts that apply within the SCPA area) were potentially applicable to the subject property. We understand from the PZHB's decision, the city council's decision, and LUBA's opinion that two of those potential zones, Station Community Residential—Low Density (SCR-LD) and Station Community Residential—Medium Density (SCR-MD), are nominally residential zones, while the chosen SCC-MM zone is nominally a commercial zone that does permit residential uses.

development." The PZHB concluded that Arrington's arguments for the SCC-MM zoning ignored "the large, well established residential neighborhoods that virtually surround the site on three sides and the Comprehensive Plan policies that require at least some amount of residential use on the property and compatibility with residential and pedestrian uses." The PZHB concluded that the SCC-MM zone does not necessarily ensure any particular level of residential use and does not assure that development is compatible with residential and pedestrian uses. For all of the above reasons, the PZHB denied the proposed zone change.

Arrington sought review of the PZHB decision before the city council. After a partial *de novo* hearing,[3] the council reversed the PZHB decision and approved the requested zone change. The council explained that nothing in the SCPA process suggested that residential uses were required on the subject property. It also rejected the view that development of SCC-MM uses could not be made compatible with the existing surrounding area. The council found that the SCC-MM zone was the most appropriate for the property. It relied, in part, on its prior determination in the adoption of the shadow zone for the property that the zone was the most appropriate one for this property and also on its view that "there has been no change in circumstance which would negate the decision made to apply the SCC-MM zone to the Arrington Property."

Petitioners then sought LUBA's review of the city council's decision. Petitioners' principal complaints before LUBA were that the property should be considered residential, not commercial, and that the city incorrectly applied certain provisions of its comprehensive plan controlling zone changes in choosing the SCC-MM zone for the property. Petitioners also asserted before LUBA that certain of the city's findings were not supported by substantial evidence. Following LUBA's affirmance of the city's decision, petitioners brought this judicial review proceeding.

---

[3] We understand from the minutes of the city council meeting that its "partial *de novo* hearing" permitted new evidence and testimony only on (1) the history of the light rail process in the area and (2) the status of the existing zoning on adjacent property west of the subject site.

On judicial review, petitioner Davis assigns error to LUBA's conclusion that the city properly applied Implementation Measure I of the Hillsboro Comprehensive Plan.[4] Petitioner Davis contends that LUBA's decision on this point was unlawful in substance.[5] The applicable criteria in the city's comprehensive plan for a zone change are found in Hillsboro Zoning Ordinance No. 1945, Volume I, Section 114(2). In order for a zone change to be approved, this section requires

"a. That the request must conform with the Hillsboro Comprehensive Plan and this Ordinance;

"b. That, where more than one designation is available to implement the Comprehensive Plan designation * * *, the applicant must justify the particular zoning being sought and show that it is best suited for the specific site, based upon specific policies of the Hillsboro Comprehensive Plan."

Petitioner Davis argues that LUBA erred in concluding that, in approving the SCC-MM zone for this property, the city complied with the Hillsboro Comprehensive Plan. Specifically, he contends that the city's decision does not comply with Urbanization Implementation Measure I of its plan. That provision states, in part, that in order to meet the burden of proof for a proposed zone change,

"it is both necessary and sufficient to show that the proposed zone is consistent with and represents the highest use allowed by the Comprehensive Plan Land Use Map, and in the case of zone changes in residential areas, the proposed zone shall allow development of housing at a density within the range designated by the Land Use Map."

Petitioner Davis asserts that the area in question here must be viewed as a residential area because of its R-6

---

[4] Petitioners Dimone adopt the assignments of error raised by petitioner Davis, *see* ORAP 5.77(4), as well as raising three other assignments of error, which we discuss below. 182 Or App at 8-15. For ease of identification, we refer to the adopted assignments of error as Davis's.

[5] See ORS 197.850(9)(a), which provides that we may reverse or remand a LUBA order if we find it to be "unlawful in substance." We have held that the phrase is the functional equivalent of the "erroneously interpreted a provision of law" standard in ORS 183.482(8)(a) that is applicable to our review of an order in a contested case issued by a state administrative agency. *1000 Friends of Oregon v. Wasco County Court*, 68 Or App 765, 777 n 10, 686 P2d 375 (1984), *modified on other grounds* 299 Or 344, 703 P2d 207 (1985).

county zoning and that, under Measure I, any new zone must allow *only* residential development. We disagree, as did LUBA. As LUBA explained, the comprehensive plan designates the area as SCPA. That plan designation is not exclusively residential: multiple uses are allowed under the designation. However, as LUBA held, even if the property were properly characterized as residential, Measure I requires only that "the proposed zone shall *allow* development of housing at a density within the range designated by the [SCPA map designation]." Nothing in the SCPA mandates specific housing densities. The SCC-MM zone *allows* several kinds of residential development. Therefore, even if Urbanization Implementation Measure I is applicable to this property, we conclude that LUBA did not err in holding that the city's decision did not violate Implementation Measure I of the city's comprehensive plan.

Petitioner Davis also assigns error to LUBA's rejection of his argument that, in approving the SCC-MM zone for this property, the city violated Station Area Community Planning Policy VI. That policy states:

> "The City should work with Washington County to ensure that lands generally west of 205th Avenue to 216th Avenue and south of the Quatama/205th Station to Baseline Road are planned for transit-oriented residential development."

The city did not view this policy as being mandatory. It concluded that its obligation under this policy was satisfied by working with the county in planning for this area. The city also concluded that, because the SCC-MM zone *allows* residential development, Policy VI was satisfied. LUBA agreed. It concluded that the city's interpretation of this policy was within its discretion under ORS 197.829(1) and *Clark v. Jackson County*, 313 Or 508, 836 P2d 710 (1992). We also agree.

On judicial review, petitioner Davis argues that Policy VI is rendered meaningless by the city's and LUBA's view that the policy is not mandatory. In petitioner's view, the policy requires that "transit-oriented residential development" *must* take place on this property. The policy, however, provides that the city "should" work with Washington County to

ensure that this area is planned for transit-oriented residential development. The city's understanding that this policy does not impose a requirement that all of this area must be residential is not inconsistent with the language of that plan provision. The text of the policy does not impose a mandatory requirement that the area be devoted only to residential use or that actions other than those in complete cooperation with the county will be in violation of the plan. We see no error in LUBA's disposition of this issue.

Petitioners Dimone and Davis both assign error to LUBA's conclusion that the city properly applied Hillsboro Comprehensive Plan, Urbanization Implementation Measure A(5). That measure provides, in part:

> "The infill of vacant, bypassed lands, between areas of development, at an urban level, shall be encouraged. Appropriate measures shall be taken to [e]nsure that new development in infill areas is compatible with existing developed areas."

In asserting that LUBA erred in concluding that the city complied with the requirements of Measure A(5), petitioners make a number of different arguments.[6] Generally, petitioners argue that LUBA erred in sustaining the city's findings in support of its conclusion that the approval of the SCC-MM zone was compatible with existing developed areas.

Respondents first respond that the decision we are reviewing involves circumstances where an appropriate *city* zone must be chosen upon the property's annexation to the city and that Measure A(5) does not apply to this type of land use decision. According to respondents, Measure A(5) applies only to "new development." Respondents assert that a proceeding such as this does not involve the approval of "new development." In their view, *no* compatibility findings under Measure A(5) are required at this time. Respondents argue

---

[6] Petitioner Davis argues to us that Measure A(5) requires the city to describe existing developed areas, potential uses allowed by the rezoning, and potential conflicts before imposing conditions to assure compatibility. Respondents complain that Davis did not make this argument before LUBA. We agree. In his argument regarding Measure A(5) to LUBA, Davis argued only that the measure did not contain language allowing the city to attach conditions to ensure compatibility of development. Accordingly, we will not consider this new argument. ORAP 5.45(4)(c); *Melton v. City of Cottage Grove*, 131 Or App 626, 628, 887 P2d 359 (1994).

that a compatibility determination is more appropriately made at the time of development review and design review when a specific proposal for development of the property is presented for approval. Respondents also argue that this is how the city interpreted the compatibility requirement of Measure A(5) and that, because petitioners have not shown that this interpretation is clearly wrong, we must defer to the city's interpretation.

■        We first note that we do not understand the city to have previously taken the exact position that respondents now urge, namely, that Measure A(5) has *no* application to an initial zoning decision made at the time of annexation of property. In fact, as LUBA found, the city, in making its zoning decision, included findings addressing compatibility with existing development. Further, as LUBA noted, the parties seemed to share the understanding that Measure A(5) had some application to this decision. As LUBA explained:

> "The parties apparently agree that HZO Volume I, Section 114(2)(a) and (b) require that the city apply HCP Urbanization Implementation Measure A(5) and take '[a]ppropriate measures' to ensure that development of the subject property under SCC-MM zoning will be compatible with existing developed areas."

As did LUBA, we conclude that the city's interpretation and application of Measure A(5) is a reasonable one that is not inconsistent with the text or context of the measure. We understand the city's interpretation to be that, although compatibility with existing developed areas must be considered at the time of rezoning, such as in this case, appropriate measures in the form of conditions may be imposed to address identified compatibility concerns and, further, that more detailed review of specific development proposals to ensure compatibility with existing developed areas will occur in the development and design review processes.

Petitioners argue that, as a matter of law, the city may not impose and rely on conditions of approval to ensure compatibility under Measure A(5). They contend that Measure A(5) does not authorize the city to impose conditions of

approval to satisfy the requirements of the measure. We disagree. The text of Measure A(5) authorizes the use of "appropriate measures." We see no error in the city's understanding that this authorization may include conditions to ensure compatibility. In fact, Hillsboro Zoning Ordinance No. 1945, Volume I, Section 114(1) expressly authorizes use of conditions when rezoning property. Section 114(1) provides:

> "Amendment of this Ordinance by amending the zoning map may be contingent upon compliance with conditions found necessary to accomplish the purposes of this Ordinance and implement the goals and policies of the Hillsboro Comprehensive Plan."

■ Petitioners also argue that, under Measure A(5), the city was required to make an express determination that it was feasible to achieve compatibility through use of conditions and that it did not do so.[7] Reading the city's findings and conclusions as a whole, the city essentially did find that compatibility could be achieved through the conditions imposed and through the applicable future review processes:

> "Additionally, the Council premises its approval of the SCC-MM zone on the Conditions included with the attached Order. These Conditions likewise address the neighbors' concerns. The Council takes specific note of opportunities for the neighbors to comment upon the future development and use of the property as part of the Development Review process. While the Council concurs that certain off-site impacts can have a detrimental [e]ffect on the neighbors' property, any form of new development on the Arrington Property will have some impacts in light of the Arrington Property's current, undeveloped condition. The City's subsequent review processes are designed to deal specifically with those kinds of off-site impacts."

We do not understand the applicable provisions of the city's plan and ordinances to require more.

Petitioners also argue in this assignment of error that the city's findings concerning compatibility with existing

---

[7] Respondents also complain that petitioners Dimone did not argue before LUBA that the city's compatibility analysis was too limited or that the city failed to make a threshold finding that it is feasible to achieve compliance with Measure A(5) through conditions. We disagree. Petitioners' arguments to LUBA, fairly read, address the same concerns that they now express on review.

developed areas are inadequate because the findings mischaracterize the nature of the adjoining properties and fail to recognize and take into consideration the residential property to the west, east, and south of the Arrington property. We understand the city's findings to treat the western and southern boundaries, consisting of arterial highways and a Bonneville Power Administration (BPA) power line right of way on the eastern part of the property, as rendering the property separate from the residential uses in those adjacent areas and, because of that, more detailed consideration of the impacts of development on this adjacent property need not be made. Petitioners Dimone assert that there is

> "nothing inherent in an arterial street or a power line that indicates they will automatically provide a fail safe buffer to ensure compatibility between the unrestricted commercial uses that will be permitted on the newly zoned subject property and the residential uses that are across the arterial street and power line."

In other words, petitioners dispute the notion that the highways and BPA right of way separate the residential areas from any effects of development on the subject property.

We agree with petitioners that highways and a BPA right of way do not, under all circumstances, automatically create a barrier between properties that prevents any effects on adjacent properties. Accordingly, we also agree that it cannot be assumed in this case that the areas adjacent to the property being rezoned will not be affected by the proposed change. In other words, we do not agree that the city's findings simply stating that the highways or the right of way separates adjacent property from the subject property are sufficient to fully answer questions about compatibility of uses on those adjacent properties.

■ Despite those deficiencies in the city's findings, however, in view of the specific conditions relating to compatibility that the city did impose[8] and the city's commitment to

---

[8] For example, the city imposed specific conditions requiring buffering between the properties:

"To mitigate potential adverse impacts between higher intensity residential, commercial, or mixed use uses on this site and existing residential uses to the north and east, the Development Review application shall consider, but not be limited to, the following design requirements:

more specifically addressing those compatibility concerns in future proceedings, we are not convinced that the city's failure at this point in the process to address potential compatibility issues in greater detail amounts to a violation of Measure A(5). As the city asserts, it is appropriate for that more detailed review to occur in future proceedings where the effects of the development on those adjacent areas may be more fully known. We therefore find no error as asserted.

Petitioners Dimone also assign error to LUBA's holding that the city's finding that a shortfall of commercial land in this area supported the decision to rezone the subject property to SCC-MM. Petitioners are correct that the city did justify the choice of zone in part on a finding that there was a significant shortfall of commercial land inventory in the Quatama/185th area. The city explained:

> "As part of the SCPA process, the City analyzed the needs for various inventories of land both generally within the City and within the SCPAs. A determination was made that there is a significant shortfall of commercial land inventory in the Quatama/185th area and that because of the Arrington Property's size, configuration and location, it could serve as an additional commercial inventory resource through the application of the SCC-MM zone.
>
> "* * * * *
>
> "As additional support for the SCC-MM zoning, the Council has reviewed actions taken by the City in 1998-'99 concerning the adjacent Gabrilis property.
>
> "The findings in the Gabrilis Plan amendment and rezoning applications, which are incorporated herein by this reference, document the need for more property available for commercial use. * * * Another important factor in

---

"a.   preservation to the greatest extent practicable of the mature evergreen trees on the western border of Tax Lots 200, 10700, and 10800, pursuant to Zoning Ordinance Section;

"b.   visual, noise, and light buffering of all higher intensity residential, commercial, or mixed use activities, including parking and loading, from adjacent existing residential properties. Buffering may include, but not be limited to, increased setbacks; use of vegetated buffers, limitations on placement of service accesses; directional lighting, sound attenuation walls, and other recognized mitigation techniques. Documentation regarding the projected effectiveness of any proposed mitigation techniques shall be included with the Development Review application."

the City's decision to redesignate the Gabrilis property to SCC-MM was the need to create a block of property, zoned identically, that could be managed effectively for access and circulation purposes. As noted in the Gabrilis decisions, the City did not want to create obvious traffic conflicts by leaving the Gabrilis parcel in residential use with the Arrington Property designated SCC-MM."

Respondents first argue that the city's findings concerning the need for commercial land are irrelevant, because there is no requirement that the city must find that there is a current unmet need for commercial land before choosing the SSC-MM zone for the property. Respondents may be correct that a need for commercial property is not a prerequisite to applying the SSC-MM zone to this property. The problem with respondents' argument, however, is that it appears from the record before us that the city's decision to impose this zone was based, in part, on its determinations that there was such a need and that allowing commercial uses on this property helps satisfy that need. The city's findings addressing the need for commercially zoned land gave no indication that the discussion was not necessary to its decision or was intended as surplusage or simply as an observation. The city's findings supporting the rezoning are stated in terms demonstrating the city council's belief that each of the reasons for its decision contributed to its ultimate decision. Were the city's findings to have stated clearly its understanding of the significance of the need issue and, in so doing, advised LUBA and us of the relative importance of the issue to its decision, our conclusion might be different. Based on the existing record, we must conclude that the need for commercial property in this area played a role in the city's decision.

■ ■  In reviewing a local government decision, we are limited to the findings and conclusions that the local government actually made. As the Supreme Court explained in *Sunnyside Neighborhood v. Clackamas Co. Comm.*, 280 Or 3, 21, 569 P2d 1063 (1977):

"What is needed for adequate judicial review is a clear statement of what, specifically, the decisionmaking body believes, after hearing and considering all the evidence, to be the relevant and important facts upon which its decision is based."

*See also 1000 Friends of Oregon v. Metro*, 174 Or App 406, 411, 26 P3d 151 (2001); *Redland Water Dist. v. Portland Metro. Area LGBC*, 63 Or App 641, 647-49, 665 P2d 1241, *rev den* 295 Or 541 (1983). If the city believes that the need for commercial land is irrelevant to its decision to apply the SCC-MM zone on remand, it can say so.

Respondents also argue that LUBA was correct in affirming the city's decision because, even if there are deficiencies in the evidence concerning the need for commercial land, it does not matter because the city also relied on a number of other factors. The problem with that argument is that, based on the existing record, on which this court and LUBA must base their decisions, we have no way of knowing if the city would have applied the SCC-MM zone if the need for commercial land was not a critical consideration. If it was a critical consideration, we do not know what the city would have done if there was no evidentiary support in the record for finding a present need for commercial property.

■ Because the city did not explain in its decision that the findings regarding the need for commercial land were not critical to its decision, LUBA and this court are not in a position to conclude that the city's findings and the supporting evidence on this issue are irrelevant. As a consequence, we must address the question of whether LUBA erred in determining that the city's finding regarding the need for commercial property was supported by substantial evidence.

As indicated in the city's findings quoted above, in determining that there was a need for commercial property, the city relied on two past determinations regarding the need for commercial property in this area. First, it relied on a determination made in the 1997 SCPA planning process. Second, it relied on the findings made in 1999 relating to the rezoning of the adjacent Gabrilis property. However, the references to earlier city determinations are the *only* information in this record supporting the city's finding of a need for commercial property in this area. None of the *evidence* supporting those earlier decisions is in this record. As LUBA acknowledges, those earlier determinations "may not establish that there is a current need for commercially zoned land." Reliance on general determinations by the city that

were made at an earlier time without *any* information about the data that supported those determinations or *any* evidence about the current status of the need for commercial land is not sufficient to support the city's finding that there was a need for commercial land at the time of the city's decision in this case. Accordingly, it is necessary to remand this matter to allow this issue to be reconsidered.

Finally, petitioners Dimone make a related assertion that LUBA erred in sustaining the city's decision because it relied on the city's prior action recommending application of the SCC-MM zone to the subject property. Petitioners assert that the city should have based its decision on the record before it, not on its earlier determination in Ordinance 4545. However, we do not understand the city's decision to have relied on its earlier determination in the manner that petitioners assert. LUBA correctly commented that it saw nothing legally improper in the city's finding that it would be unfair or unwise to apply a different zone from that applied in the 1997 action recommending the SCC-MM designation. LUBA did not understand the city's finding to signal a city belief that it was *bound* to apply the recommended zoning notwithstanding its plan and ordinance criteria. Rather, LUBA correctly concluded "that the city council recognized that its rezoning decision must be based on the applicable approval criteria and could not rest entirely on a prior planning process that did not result in a final rezoning decision." We find no error in LUBA's analysis or disposition of this issue.

Reversed and remanded for further proceedings consistent with this opinion.