Argued and submitted December 9, 2014, affirmed October 28, 2015

Patricia ZIMMERMAN,
*Petitioner,*

*v.*

LAND CONSERVATION AND
DEVELOPMENT COMMISSION
and City of Scappoose,
*Respondents.*

Land Conservation and Development Commission
13UGB001829; A153856

361 P3d 619

Michael F. Sheehan argued the cause and filed the briefs for petitioner.

Stephanie L. Striffler, Assistant Attorney General, argued the cause for respondent Land Conservation and Development Commission. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Timothy V. Ramis argued the cause for respondent City of Scappoose. With him on the brief were Damien R. Hall and Jordan Ramis PC.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

SERCOMBE, P. J.

## SERCOMBE, P. J.

Petitioner seeks review of a Land Conservation and Development Commission (LCDC or commission) order that upheld an approval by the Department of Land Conservation and Development (DLCD or department) director of a legislative amendment to the City of Scappoose's urban growth boundary (UGB). Petitioner contends that certain portions of the LCDC order that overruled her objections to the approval are "[u]nlawful in substance" under ORS 197.651(10)(a). Petitioner argues that, in sustaining the approval, LCDC improperly interpreted and applied state-wide planning goals, along with other administrative rules, that require determination of an employment forecast and employment land need as part of the justification of a UGB change to add industrial and commercial land. We conclude that LCDC's interpretation of the rules is plausible, and that LCDC adequately explained both why the UGB amendment was justifiable under those rules and how it applied its own substantial evidence standard of review.[1] Accordingly, we affirm the order under review.

## I.   THE LEGAL CONTEXT

This review proceeding arises in the following legal context. Under ORS 197.175(1), cities and counties must exercise their planning and zoning responsibilities in accordance with state land use statutes and special rules (goals) approved by LCDC. Those localities must also "[p]repare, adopt, amend and revise comprehensive plans in compliance with goals approved by [LCDC]." ORS 197.175(2)(a). One of those goals, Goal 14 (Urbanization), requires a city to adopt and maintain an urban growth boundary around its city limits "to provide land for urban development needs and to identify and separate urban and urbanizable land from rural land." OAR 660-015-0000(14). Establishment and change of a UGB must be based on a number of factors, including a "[d]emonstrated need for *** employment opportunities." *Id.* Under OAR 660-024-0040(5), in turn, the determination

---

[1] Petitioner also asserts that the LCDC order improperly applied the relevant rules in approving expansion of the boundary to add land for airport-related uses and that the commission erred in approving an incomplete inventory of land available for employment uses. We reject those contentions without discussion.

of that need "must comply with the applicable requirements of Goal 9 and OAR chapter 660, division 9, and must include a determination of the need for a short-term supply of land for employment uses consistent with [OAR] 660-009-0025."

Goal 9 (Economic Development) directs cities to "provide adequate opportunities throughout the state for a variety of economic activities." OAR 660-015-0000(9). It further provides:

"Comprehensive plans for urban areas shall:

"1. Include an analysis of the community's economic patterns, potentialities, strengths, and deficiencies as they relate to state and national trends;

"2. Contain policies concerning the economic development opportunities in the community;

"3. Provide for at least an adequate supply of sites of suitable sizes, types, locations, and service levels for a variety of industrial and commercial uses consistent with plan policies;

"4. Limit uses on or near sites zoned for specific industrial and commercial uses to those which are compatible with proposed uses."

*Id.*; *see also* ORS 197.712(2) (codification of Goal 9 requirements for urban comprehensive plans). LCDC, in turn, has adopted rules, found at OAR chapter 660, division 9, to implement Goal 9 and ORS 197.712(2). One of those rules provides guidance on the content of an economic opportunities analysis (EOA). *See* OAR 660-009-0015.

Thus, in order to justify a UGB expansion to add employment land, a city must demonstrate under Goal 14 that the land is needed for economic opportunities, and, more specifically, must justify that need based on an EOA that is adopted under Goal 9 and its implementing rules.

Much of the dispute in this case concerns the interpretation and application of the EOA rule, OAR 660-009-0015. Under OAR 660-009-0015, as part of the justification for a comprehensive plan amendment, a city must compare the "demand for land for industrial and other employment uses to the existing supply of such land" through a "review

of national, state, regional, county, and local trends," identification of "site characteristics typical of expected uses[,]" "[i]nventory of [i]ndustrial and [o]ther [e]mployment lands," and "assessment of [the] community economic development potential." A city has some flexibility in the development of an EOA:

> "The effort necessary to comply with OAR 660-009-0015 through 660-009-0030 will vary depending upon the size of the jurisdiction, the detail of previous economic development planning efforts, and the extent of new information on national, state, regional, county, and local economic trends. *A jurisdiction's planning effort is adequate if it uses the best available or readily collectable information to respond to the requirements of this division.*"

OAR 660-009-0010(5) (emphasis added).

The issues in this case pertain to whether DLCD and LCDC correctly applied the OAR chapter 660, division 9, rules—and, in particular, OAR 660-009-0010(5)'s requirement that a city use the "best available" information in developing an EOA—as well as related rules implementing Goals 2 and 14 in determining that the city's comprehensive plan amendments and UGB change were consistent with the statewide planning goals.

## II.  PROCEDURAL HISTORY

In early 2011, following three years of study and hearings, the city enacted an ordinance to amend its comprehensive plan and zoning code to add (1) a medium-growth population forecast; (2) an EOA; (3) an additional 380 acres of designated industrial and commercial land to the UGB (primarily to accommodate planned industrial growth for airport-related employment in addition to planned commercial growth); (4) a redesignation of some property from industrial to airport employment use; and (5) textual changes to the plan policies on economic growth, public facilities and services, the urban growth boundary, and general land use.

The adopted 2011 EOA was drafted by a private consultant and was based, in part, on information gathered by the consultant at the time of its initial preparation in 2008. That initial information was supplemented by

(1) information obtained by a city advisory committee and the planning commission in 2010 in making their recommendations to the council on the EOA and (2) evidence obtained by the city council during the hearings on the plan amendment ordinance.

The EOA report set out the rate of job growth in the city between 2003 and 2007 (prior to the economic recession), assumed a modest decline in employment in the urban area between 2008 and 2010 (during the recession), and then extrapolated from that employment base a robust projection of likely new employment between 2010 and 2030 (the planning period). That projection of future employment was calculated using a high annual growth rate of employment. That growth rate was, in turn, based on the report's analysis of national, state, regional, and local trends, and an assessment of the economic development potential created by the city's ability to provide land for businesses that either want to be near the Portland metropolitan area or need to be located near the Scappoose airport. LCDC summarized the city's conclusions on the need for employment land as follows:

"The EOA justifies the potential for strong employment growth in Scappoose over the 20-year planning period as resulting from a number of factors, most notably Scappoose's locational advantage in relation to Portland and Hillsboro, the presence of the Scappoose Industrial Airpark and related aviation employers, and a documented shortage of certain types of industrial sites within the boundary of Metro. Record at 92-96. The city has identified an employment land need over the planning period, totaling 483 gross acres, based on an analysis of economic opportunities and the site needs of target industries deemed reasonable and appropriate to achieving the city's economic development objectives, and thus has justified deviating from a straight-line economic forecast based entirely upon historical employment trends. Of the 483 total gross acres, 269 acres is forecast as the industrial land need, 64 acres is forecast for office land need, 40 acres is forecast for retail commercial land need, and 110 acres is forecast for specialized land needs. Record at 98. The specialized land need includes 50 acres for an airport runway expansion, 40 acres of airport hangar space, and 20 acres for a proposed community college site."

In response to criticism by petitioner and others of some of the factual assumptions in the EOA, the city council approved changes to the report and adopted supplemental findings as part of the UGB amendment ordinance.

The UGB amendment ordinance, including the adopted EOA, was submitted by the city to DLCD for approval.[2] Petitioner and others filed written objections with the department. Using the processes set out in ORS 197.633(4) and OAR 660-025-0150, the DLCD director denied the objections and approved the UGB amendment ordinance. Petitioner appealed that approval to LCDC, identifying a number of asserted errors in the decision. LCDC affirmed the director's decision, entered findings on petitioner's claims of error, and approved the ordinance. Petitioner now seeks judicial review of LCDC's order.

## III.  STANDARDS OF REVIEW

We begin by noting one of the difficulties in evaluating petitioner's contentions on review: Petitioner's assertions are not framed consistently with our standards of review for an LCDC order on a UGB change. A final LCDC order approving a UGB amendment "may be appealed to the Court of Appeals in the manner described in ORS 197.650 and 197.651." ORS 197.626(2). However, ORS 197.651(9)(b) provides that the court "[m]ay not substitute its judgment for that of [LCDC] as to an issue of fact." Indeed, pursuant to ORS 197.651(10), the court must reverse or remand the order only if the court finds it to be "[u]nlawful in substance or procedure," "[u]nconstitutional," or "[n]ot supported by substantial evidence in the whole record as to facts found by the commission." As we noted in *Barkers Five, LLC v. LCDC*, 261 Or App 259, 285 n 18, 323 P3d 368 (2014), the standard

---

[2] Under ORS 197.626(1)(b), a UGB amendment must be submitted to LCDC for review "in the manner provided for review for a work task." Under ORS 197.628, comprehensive plans and local land use regulations must be updated regularly ("periodic review") and those updates must be approved by LCDC under the procedures specified in ORS 197.633 and OAR chapter 660, division 25. Those procedures confer standing to "[p]ersons who participated orally or in writing in the local process," OAR 660-025-0140(2), to object to the plan and regulation submission. Objections are adjudicated and the submission is approved or denied by the DLCD director (or the submission is referred to LCDC for resolution). ORS 197.633(5). An approval may be appealed to LCDC by an objector. OAR 660-025-0150(6)(a).

of review of LCDC orders in ORS 197.651(10) is "substantively akin to our standard of review of Land Use Board of Appeals orders. *Compare* ORS 197.651(10) (standard for reviewing LCDC orders), *with* ORS 197.850(9) (standard for reviewing LUBA orders)."

The "unlawful in substance" review standard for LUBA orders under ORS 197.850(9)(a)—and, by analogy, for review of LCDC orders under ORS 197.651(10)—is for "a mistaken interpretation of the applicable law." *Mountain West Investment Corp. v. City of Silverton*, 175 Or App 556, 559, 30 P3d 420 (2001). In *Dimone v. City of Hillsboro*, 182 Or App 1, 6 n 5, 47 P3d 529 (2002), we explained that the "unlawful in substance" standard "is the functional equivalent of the 'erroneously interpreted a provision of law' standard in ORS 183.482(8)(a) that is applicable to our review of an order in a contested case issued by a state administrative agency."

We give deference, however, to LCDC's interpretation and application of its own rules. As set forth in *Barker's Five*:

> "We will defer to LCDC's 'plausible interpretation of its own rule[s], including an interpretation made in the course of applying the rule, if that interpretation is not inconsistent with the wording of the rule, its context, or any other source of law.' *DeLeon, Inc. v. DHS*, 220 Or App 542, 548, 188 P3d 354 (2008) (citing *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 881 P2d 119 (1994)); *see also 1000 Friends of Oregon v. LCDC (Lane Co.)*, 305 Or 384, 390, 752 P2d 271 (1988) (explaining that the legislature's entrustment of an agency 'both with setting standards and with applying them can imply that the agency's view of its standards (assuming that they are within their authorizing law and consistently applied) is to be given some appropriate respect by the courts')."

261 Or App at 302-03.

Finally, "the focus of our review is on the issues presented on appeal that have been preserved before LCDC." *1000 Friends of Oregon v. LCDC*, 244 Or App 239, 268, 259 P3d 1021 (2011) (*1000 Friends of Oregon (McMinnville)*). Petitioner's claim that the LCDC order is "unlawful in substance" is limited to evaluating the legal correctness of

LCDC's resolution of her objections to the DLCD director's approval of the ordinance. We turn, then, to that evaluation.

## IV.   LEGAL SUFFICIENCY OF THE LCDC ORDER

As noted, OAR 660-009-0015 requires cities and counties to adopt an EOA in their comprehensive plans to "compare the demand for land for industrial and other employment uses to the existing supply of such land," and to do that comparison through an evaluation of "national, state, regional, county and local trends," identification of "site characteristics typical of expected uses[,]" "[i]nventory of [i]ndustrial and [o]ther [e]mployment lands," and "assessment of community economic development potential."[3]

---

[3]  OAR 660-009-0015 provides, in part:

"Cities and counties must review and, as necessary, amend their comprehensive plans to provide economic opportunities analyses containing the information described in sections (1) to (4) of this rule. This analysis will compare the demand for land for industrial and other employment uses to the existing supply of such land.

"(1) Review of National, State, Regional, County and Local Trends. The economic opportunities analysis must identify the major categories of industrial or other employment uses that could reasonably be expected to locate or expand in the planning area based on information about national, state, regional, county or local trends. This review of trends is the principal basis for estimating future industrial and other employment uses as described in section (4) of this rule. A use or category of use could reasonably be expected to expand or locate in the planning area if the area possesses the appropriate locational factors for the use or category of use. Cities and counties are strongly encouraged to analyze trends and establish employment projections in a geographic area larger than the planning area and to determine the percentage of employment growth reasonably expected to be captured for the planning area based on the assessment of community economic development potential pursuant to section (4) of this rule.

"(2) Identification of Required Site Types. The economic opportunities analysis must identify the number of sites by type reasonably expected to be needed to accommodate the expected employment growth based on the site characteristics typical of expected uses. Cities and counties are encouraged to examine existing firms in the planning area to identify the types of sites that may be needed for expansion. Industrial or other employment uses with compatible site characteristics may be grouped together into common site categories.

"(3) Inventory of Industrial and Other Employment Lands. Comprehensive plans for all areas within urban growth boundaries must include an inventory of vacant and developed lands within the planning area designated for industrial or other employment use.

"* * * * *

"(4) Assessment of Community Economic Development Potential. The economic opportunities analysis must estimate the types and amounts of

In her first assignment of error, petitioner asserts that LCDC erred in approving the city's determinations in the EOA regarding future employment growth and the resulting need for additional land for employment uses. Petitioner contends that LCDC's approval order "violates OAR 660-009-0010(5)" ("A jurisdiction's planning effort is adequate if it uses the best available or readily collectable information to respond to the requirements of this division.") and Goal 2 (requiring "an adequate factual base" for land use decisions), and is lacking in substantial evidence (because various city findings are not supported by substantial evidence), more specifically because the order:

(1)   Approved the city's use of stale information in the EOA (city job increases from 2003 to 2007 and assumed decline in employment between 2008 and 2010) to make findings about the city's 2010 job base (from which it extrapolated job growth through 2030), rather than more complete, current data that was presented at the hearings that showed actual job losses during the 2008 to 2011 recession and that, according to petitioner, more accurately determined the number of jobs in the city in 2010;

(2)   Approved the EOA employment forecast based on limited "information about national, state, regional, county or local trends" under OAR 660-009-0015(1) (extrapolation of the city job growth rate from 2003

---

industrial and other employment uses likely to occur in the planning area. The estimate must be based on information generated in response to sections (1) to (3) of this rule and must consider the planning area's economic advantages and disadvantages. Relevant economic advantages and disadvantages to be considered may include but are not limited to:

"(a) Location, size and buying power of markets;

"(b) Availability of transportation facilities for access and freight mobility;

"(c) Public facilities and public services;

"(d) Labor market factors;

"(e) Access to suppliers and utilities;

"(f) Necessary support services;

"(g) Limits on development due to federal and state environmental protection laws; and

"(h) Educational and technical training programs."

to 2007), rather than broader, tri-county data on long-term, historic growth rates that are a necessary component of trend analysis under the rule;

(3) Improperly concluded that the city's findings about its share of future, regional employment growth were supported by substantial evidence in the whole record and failed to require that the city coordinate those determinations with other jurisdictions as required by Goal 2; and,

(4) Erred in concluding that the city findings that additional land supply would attract job-creating businesses were supported by substantial evidence in the whole record.

Some aspects of those contentions can be quickly dispatched in light of our standards of review. As noted, we have a limited standard of review over LCDC's determinations about the sufficiency of the evidence to support the city's factual findings in the EOA about future employment growth, share of regional growth, and the effect of providing additional employment land. We do not review the sufficiency of the city record to support its factual findings to see if our conclusions in that regard match those of LCDC. To do so would run afoul of ORS 197.651(9)(b), which provides that the court "[m]ay not substitute its judgment for that of [LCDC] as to an issue of fact."

Instead, as noted, our review under the "unlawful in substance" standard is limited to determining "whether [LCDC] applied the correct legal test in deciding whether [the city's] decision is supported by substantial evidence." *1000 Friends of Oregon (McMinnville)*, 244 Or App at 267-68 (internal quotation marks omitted). We conclude that it did. LCDC determined that,

"[o]n review, the commission considers whether the submittal is consistent with the applicable goals and administrative rules and is supported by substantial evidence. OAR 660-025-0160(2)(a) and (c). *** The Goal 2 requirement for an adequate factual base requires that a legislative land use decision be supported by substantial evidence. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a

reasonable person to make that finding. Where the evidence in the record is conflicting, if a reasonable person could reach the decision the city and county made in view of all the evidence in the record, the choice between conflicting evidence belongs to the local government. \* \* \* Where substantial evidence in the record supports the city and county's adopted findings concerning compliance with the Goals and the commission's administrative rules, the commission nevertheless must determine whether the findings lead to a correct conclusion under the Goals and rules."[4]

(Citations omitted.) Therefore, to the extent petitioner asks us, in her first assignment of error, to reexamine LCDC's assessment of the substantiality of the evidence to support the city's findings in its EOA, she ignores the applicable standards of review. The commission properly stated and applied the substantial evidence rule and, accordingly, its order was not "unlawful in substance" in that regard.[5] We

---

[4] LCDC also correctly framed its standard of review over the reasoning adopted by the city in support of the UGB amendments. It determined that

"[t]here is no statute, statewide planning goal or administrative rule that generally requires that legislative land use decisions be supported by findings. *Port of St. Helens v. City of Scappoose,* 58 Or LUBA 122, 132 (2008). However, there are instances where the applicable statutes, rules or ordinances require findings to show compliance with applicable criteria. In addition, where a statute, rule or ordinance requires a local government to consider certain things in making a decision, or to base its decision on an analysis, 'there must be enough in the way of findings or accessible material in the record of the legislative act to show that applicable criteria were applied and that required considerations were indeed considered.' *Citizens Against Irresponsible Growth v. Metro,* 179 Or App 12, 16 n 6, 38 P3d 956 (2002). Such findings serve the additional purpose of assuring that the commission does not substitute its judgment for that of the local government. *Id.; Naumes Properties, LLC v. City of Central Point,* 46 Or LUBA 304, 314 (2004)."

We add that, under ORS 197.633(3)(c), LCDC's review "[f]or issues concerning compliance with applicable laws, is whether the local government's decision on the whole complies with applicable statutes, statewide land use planning goals, administrative rules, the comprehensive plan, the regional framework plan, the functional plan and land use regulations."

[5] The first assignment of error suffers from another overarching deficiency. ORAP 5.45(3) requires an appellant to "identify precisely the legal, procedural, factual or other ruling that is being challenged." The assignment of error broadly claims various errors in LCDC's approval of portions of the EOA. But it fails to clearly identify and claim error in the particular rulings of the commission that resolved the objections raised by petitioner to the director's approval as required by *1000 Friends of Oregon (McMinnville),* 244 Or App at 268. We will reframe the assignment of error accordingly and then assess whether the LCDC order was unlawful in substance in that particular.

turn, then, to the remaining issues raised by petitioner's challenges to LCDC's order.

    1.  *Whether LCDC erred under OAR 660-009-0010(5) and Goal 2 in approving the use of stale data by the city to compute the baseline employment for 2010 in the EOA*

So framed, this contention pertains to LCDC's resolution of petitioner's first objection to the director's approval. Before the director, petitioner complained about the city's use of 2003 to 2007 employment data, and an assumed moderate loss of jobs during the 2008 to 2010 recessionary period, to arrive at the number of jobs in the city in 2010. (The city applied an annual employment growth rate to that baseline employment level to arrive at the number of jobs and employment land needs in 2030, the end of the planning period.) Petitioner complained that other data submitted into the record showed the actual job losses in 2008 to 2010 as slightly more than assumed by the city in making the baseline employment projection for 2010 in the EOA. Petitioner argued that the city's failure to consider all of that evidence in the record meant that the EOA was not based on the "best available or readily collectable information" under OAR 660-009-0010(5).

The director concluded that the city did not need to analyze the new information in its adopted EOA, and could consider, as part of the adopted EOA, just the information available when the EOA was drafted: "A city is not required to restart its analysis each time new information becomes available. *** The city made reasonable conclusions based on data that was available at the time the study took place." Petitioner objected to those conclusions before LCDC, reasoning that they were (1) incorrect because the EOA was amended as a result of new evidence submitted in the public hearings by the project's consultant but not as a result of additional evidence submitted by opponents and (2) wrong because a local government is obliged to consider all of the evidence in the record in making its findings and conclusions to support a UGB change.

LCDC partially agreed with petitioner. The commission interpreted OAR 660-009-0010(5) to allow an EOA

to be based on information available or collectable at the time of the preparation of the analysis, and concluded that newer information would not "require the city to undertake multiple, shifting iterations of the same analysis as it moves through the planning and adoption process." More to the point, however, LCDC determined that,

"[a]ssuming for the purposes of discussion that OAR 660-009-0010(5) or Goal 2 required the city to consider new employment data throughout the planning process, the standard would be whether the city reasonably relied on the employment data information in the record that formed the basis of its EOA, when viewing the record as a whole, including the new employment data that appellants cite. So long as the new employment data does not make it unreasonable for the city to rely on the employment data that it did, the choice between conflicting evidence is the city's. The appellants have not established and the commission does not find that a reasonable person could not have relied on the employment data the city used.

"* * * The Scappoose EOA updated the base employment data by evaluating economic trends up to 2010 and current knowledge about economic activity in Scappoose during that time.

"* * * The city did not ignore the testimony regarding new data, as is alleged. The council responded to the testimony in its deliberations, explaining why it did not choose to alter the base year for the assumptions within the EOA. * * * In addition, the consultant that prepared the EOA for the city responded to testimony regarding this objection to the Columbia County Board of Commissioners as part of its deliberations."

(Citation omitted.)

On review, petitioner argues that LCDC erred in (1) interpreting the "best available or readily collectable information" in OAR 660-009-0010(5) to mean the information available at the time an EOA is prepared; (2) determining that a reasonable person could rely on hypothetical, rather than actual, employment counts for 2010 in making the findings adopted by the city; and (3) determining that the base employment data had been updated by the city based on 2007 to 2009 countywide economic trends when the basis for that update is not apparent in the EOA.

As earlier noted, we defer to LCDC's interpretation of its own rules if that interpretation is plausible in light of the rule's text and context and other sources of law. *Barker's Five*, 261 Or App at 302-03. To reiterate, OAR 660-009-0010(5) provides that

"[t]he effort necessary to comply with OAR 660-009-0015 through 660-009-0030 will vary depending upon the size of the jurisdiction, the detail of previous economic development planning efforts, and the extent of new information on national, state, regional, county, and local economic trends. A jurisdiction's planning effort is adequate if it uses the best available or readily collectable information to respond to the requirements of this division."

OAR 660-009-0015 to 660-009-0030 are a series of rules governing the content and justification for those portions of a comprehensive plan that implement Goal 9, including OAR 660-009-0015, the EOA rule.

LCDC's interpretation of "the best available or readily collectable information" in OAR 660-009-0010(5) is plausible. As noted, the commission concluded that the database used in connection with preparation of an EOA could be the information available at the time of preparation, so long as that information is not significantly undercut by evidence made part of the EOA adoption record. An EOA is drafted prior to the public hearings on its adoption, typically through a separate community visioning process. *See* OAR 660-009-0015(5) ("Cities and counties are strongly encouraged to assess community economic development potential through a visioning or some other public input based process in conjunction with state agencies."). Thus, "the best available or readily collectable information to respond to the requirements of this division" under OAR 660-009-0010(5), for purposes of preparation of an EOA, means the requirement of a prehearing formulation of the analysis in conjunction with that visioning process. LCDC did not err in concluding that the "best available or readily collectable information" for that requirement means the information available at the time of that formulation and visioning.

What is the "best available" information in the preparation of an EOA is a different question than whether

substantial evidence in the whole record supports particular employment land findings made to justify the UGB change. Petitioner's objections in that regard amount to assertions that the employment projection findings lack substantial evidence. However, LCDC properly stated the substantial evidence rule in determining those objections. It concluded that the employment projection findings may be based upon the EOA provided that the additional "employment data does not make it unreasonable for the city to rely on the employment data that it did[.]" Thus, we do not reach petitioner's objections about LCDC's application of the substantial evidence rule—that the information relied upon by the city to make those employment projections was insubstantial either because a reasonable person would not rely upon that information or because the information was not substantiated clearly. As noted earlier, resolution of those objections is not within our scope of review of the commission's order. *See 1000 Friends of Oregon (McMinnville)*, 244 Or App at 267-68.

> 2. *Whether LCDC erred in approving the city's use of employment growth during 2003 to 2007 in Scappoose as a relevant "local trend" in the preparation of the EOA under OAR 660-009-0015*

Before DLCD, petitioner asserted that the city's decision was legally defective because the future employment growth rate used by the city in the EOA to calculate the expected number of jobs in 2030 was based, in part, on employment growth in the city from 2003 to 2007. According to petitioner, that period of time was not a "bona-fide long term trend[,]" and, therefore, the EOA was inconsistent with OAR 660-009-0015(1). That rule requires that an EOA be "based on information about national, state, regional, county or local trends" and with Goal 2's requirement that land use decisions be based on an "adequate factual base." The director concluded that the EOA did contain information about trends and that the information was not "deficient." The director also noted that the "EOA does not base the employment projection solely on the historic period the objection alleges," but, instead, based the projected growth rate on other information and trends.

Petitioner disputed that determination before LCDC. She asserted that the other information relied upon by the city was incomplete or undocumented and insufficient to support the growth rate used by the city to calculate future employment. LCDC concluded that the city had, in fact, based its future growth rate on information in addition to the 2003 to 2007 employment growth rate and that all of that evidence was used "to compile an adequate factual basis" for the projected employment land need.

On review, petitioner contends that LCDC approved an "employment forecast based on short-term economic 'boom' years growth rates despite longer-term, historical trends and regional forecasts that are much lower[.]" Petitioner also asserts that the EOA did not contain sufficient evidence. We conclude that the LCDC's explanation of its reasoning was sufficient—the city did not base its adopted future employment growth rate solely on data from 2003 to 2007, and LCDC did not determine that that information alone was substantial evidence to support the growth rate finding. Moreover, petitioner's criticism of the quality and sufficiency of the evidence about employment growth rates in the EOA does not demonstrate that LCDC misunderstood its substantial evidence standard of review. Whether the city or LCDC could reach a different conclusion about the future rate of job growth in Scappoose is beside the point in light of our standard of review.

3. *Whether LCDC approved a decision based on Scappoose capturing an amount of regional employment growth that is not based on substantial evidence, and instead improperly relied on capturing employment growth planned to occur within other jurisdictions*

Before the director, petitioner asserted that the part of the EOA that projected that, because of its close location to the Portland metropolitan area and the likelihood of new jobs associated with an expanded Scappoose airport, the city would add new employment was inconsistent with the requirements of OAR 660-009-0010(5), OAR 660-009-0015(1), and Goal 2. Specifically, she contended that that part of the EOA did not comply with the "best available or

readily collectible information" requirement of OAR 660-009-0010(5), the requirement in OAR 660-009-0015(1) that a city is "strongly encouraged [in an EOA] to analyze trends and establish employment projections in a geographic area larger than the planning area," or Goal 2's requirements that a comprehensive plan be coordinated and supported by an "adequate factual base." She also argued that that part of the EOA was not supported by substantial evidence. The director concluded that the city's employment land need determination was based on an adequate factual base. Petitioner reiterated her objections before LCDC.

LCDC determined that the city did, in fact, partially base its employment land needs determination on employment projections from a larger, regional planning area, and that the determination was based on an adequate factual base. In particular, LCDC determined that "the city provided a rationale for its determination regarding the amount of regional employment growth the city will capture, noting Scappoose's location adjacent to the Portland Metro area, the lack of industrial lands supply in the Portland Metro area, and the strategic advantage of the Scappoose Airpark's location adjacent to the city." LCDC also noted the city's specific findings with respect to its "locational advantages adjacent to the Portland metropolitan area[,]" past employment growth rates in the city that exceed those within the Portland metropolitan area, a demonstrated shortage of industrial lands in the Portland metropolitan area "leading to increased demand for such sites in neighboring cities such as Scappoose[,]" projections that a significant amount of employment growth associated with the Portland area will occur outside the region's UGB, and with respect to the relatively small number of projected new jobs for Scappoose compared to the region as a whole. LCDC concluded that "such information and analysis constitutes substantial evidence to demonstrate why Scappoose would capture employment growth in the Portland region at a rate significantly greater than employment growth proportional to its population."

On review, petitioner asserts that LCDC erred in determining that the city's findings on its projected share of regional employment growth were supported by substantial

evidence and that the findings noted by the commission provide a sufficient "legal or factual justification for the City's chosen forecast." Petitioner argues that the findings cited by LCDC have less probative value than other evidence in the record and that, even if they show some capture of regional employment growth, they do not justify the extent of the city's projected share of that growth. As noted, in reviewing UGB amendment approvals by LCDC, we do not reevaluate whether a locality's findings are supported by substantial evidence. At bottom, petitioner's contentions about the sufficiency of the evidence to support the city's forecast of employment growth is nothing more than an argument that a reasonable person could not have made the factual conclusion that the city did about its future share of regional employment growth. Petitioner suggests that the evidence was too weak to overcome the assumption that the share would be in the future what it has been in the past. Petitioner did not explicitly argue below nor does she argue on review that LCDC should have remanded the boundary decision because the city misapplied the law in considering the evidence.

Put another way, petitioner does not argue that in deciding "the percentage of employment growth reasonably expected to be captured for the planning area based on the assessment of community economic development potential" in an EOA under OAR 660-009-0015(1), the city could not consider the facts identified by LCDC as relevant to "community economic development potential." As we understand it, petitioner's complaint goes not to the relevance, but to the sufficiency of the evidence to support the city's findings. That determination is one for the commission, not this court.

Petitioner also asserts that there is a "lack of Goal 2 coordination" in the city's determination of its share of future regional job growth. Goal 2 requires that "[e]ach plan and related implementation measure shall be coordinated with the plans of affected governmental units." OAR 660-015-0000(2). "Coordinated" is defined in ORS 197.015(5), which, in turn, provides that "[a] plan is 'coordinated' when the needs of all levels of governments, semipublic and private

agencies and the citizens of Oregon have been considered and accommodated as much as possible."

In her objections to the DLCD approval, petitioner does not specifically advance a Goal 2 contention, but does "restate all of [the arguments raised in her objections to the department] in support of this appeal." In those objections below, petitioner asserted:

"LUBA has held that if a city located outside the Metro UGB wishes to plan to capture growth currently antici-pated to occur within the Metro UGB, then it must specif-ically coordinate that desire with Metro and the affected units of government within the Metro UGB. *1000 Friends of Oregon v. City of North Plains*, 27 Or LUBA 372[, *aff'd*, 130 Or App 406, 882 P2d 1130] (1994)."

In *City of North Plains*, LUBA determined that, within Metro's planning area, when a city expanded its urban growth boundary for employment uses already planned to be accommodated within the Metro UGB, the city must "coordinate its expanded UGB plan with Metro and other affected units of government or * * * attempt to justify the enlargement of its UGB without relying on growth antici-pated to occur within the Metro UGB." *City of North Plains*, 27 Or LUBA at 385.

Petitioner's objection to the agency order under Goal 2 is insufficiently developed for review. Petitioner does not explain what plan of a governmental unit is "affected" by the city's analysis of its share of the employment growth expected to occur outside of the UGB of Portland-area cities, so as to arguably require coordination under Goal 2. The Goal 2 coordination principle articulated by LUBA in the *City of North Plains* case, even assuming that we would agree with that holding, is inapposite. Here, in the EOA analysis of cap-turing regional employment growth, the city noted that it could "easily" capture a small percentage of the employment growth projected by Metro to occur outside its UGB. The city did not seek to capture growth planned to occur within the Metro UGB and associated with the cities within that boundary, as was the case in *City of North Plains*. Petitioner points to no text in Goal 2, or in rules that implement that or other goals, that require the city to coordinate its EOA

employment growth projections for areas outside of its UGB with another city's planned growth located elsewhere and inside of a UGB.[6]

LCDC concluded that the city had coordinated the UGB amendment with Columbia County under the cooperative process required by Goal 14. OAR 660-015-0000(14) ("Establishment and change of urban growth boundaries shall be a cooperative process among cities, counties and, where applicable, regional governments."). Petitioner advances no legal basis for any further coordination requirement. Accordingly, we conclude that LCDC's determination of Goal 2 compliance was legally sufficient.

4. *Whether the city assumed the proposed UGB expansion will cause a substantial increase in population growth, beyond historical trends*

Before DLCD, petitioner argued that it was unlawful for the city to base its projected employment growth, in part, on "increased employment opportunities near the airport as a result of the proposed UGB expansion." Petitioner claimed that the lack of development of existing industrial parcels near the airport undercut the city's assumption that an additional supply of vacant parcels would be a catalyst for future development. The director determined that it was lawful to plan for greater employment and employment land need than would be indicated simply by extrapolating from prior employment growth and land development. The city could do so by following the Goal 9 rule, by "identify[ing] opportunities, determin[ing] the types and characteristics of sites needed to attract employers, estimat[ing] at least an adequate number of sites, and * * * accommodat[ing] the needed number of suitable sites for the 20-year planning period." Petitioner reiterated her objection before LCDC, suggesting that it was circular reasoning to justify bringing additional employment land into the boundary solely to induce new employment, and that the need determination requires more particular justification.

---

[6] In fact, the applicable rule suggests that any coordination is not mandatory. OAR 660-009-0030 provides that localities are "strongly encouraged to coordinate" their economic opportunities analysis with other jurisdictions.

LCDC agreed. It concluded that the city could plan for more employment land than needed based on historic trends, but explained that the additional employment land need must be separately justified under the goals and rules:

"The city's *intention* is to deviate from the historic trend by providing more employment for its citizens, a policy choice that is consistent with Goal 9 and its implementing rules. *See* Economics Policy 4; Record at 142. As stated in the response to Objections 2 and 3 [involving the application of OAR 660-009-0015, the EOA rule], Scappoose has provided an evidentiary background that supports the feasibility of such a policy."

(Emphasis in original.)

On review, petitioner contends that LCDC did not address her objection that "'increased employment opportunities near the airport as a result of the proposed UGB expansion' is not a valid reason for concluding that rapid future growth is reasonable or feasible." We disagree. LCDC plainly concluded that the city could—and did—justify adding new industrial land through the process ordained by the Goal 9 rule. As noted, OAR 660-009-0015(1) allows a determination of employment land needs based on locational factors, such as proximity to an expanding regional airport: "A use or category of use could reasonably be expected to expand or locate in the planning area if the area possesses the appropriate locational factors for the use or category of use." LCDC committed no error in concluding that petitioner's contention was consistent with applicable law.

    5.  *Whether, by approving a UGB based on an employment forecast that is significantly inconsistent with the adopted population forecast, LCDC's order violated OAR 660-024-0040(1), OAR 660-024-0040(5), Goal 14, Goal 2 (adequate factual base), and lacked substantial evidence in the whole record*

In her objections to the director, petitioner argued that the EOA violated *former* OAR 660-024-0040(1).[7] That rule provided:

---

    [7] OAR 660-024-0040(1) was amended after LCDC issued its order in this case. We refer to the regulation as it appeared at the time that the action was before LCDC.

"The UGB must be based on the adopted 20-year population forecast for the urban area as described in OAR 660-024-0030, and must provide for needed housing, employment and other urban uses such as public facilities, streets and roads, schools, parks and open space over the 20-year planning period consistent with the land need requirements of Goal 14 and this rule. The 20-year need determinations are estimates which, although based on the best available information and methodologies, should not be held to an unreasonably high level of precision."

OAR 660-024-0040(5) further states:

"Employment land need may be based on an estimate of job growth over the planning period; local government must provide a reasonable justification for the job growth estimate but Goal 14 does not require that job growth estimates necessarily be proportional to population growth."

Petitioner argued that the 20-year population forecast for the city was a population of 10,022, an increase of 3,342 persons from the 2010 population of 6,680 persons. The EOA, nonetheless, predicted a 2030 job total of 10,492, an increase of 8,067 jobs from the 2010 total of 2,425 jobs. Petitioner claimed that the job-per-resident ratio for 2030 in the EOA was improbably high as compared with the historic ratio in the city and with the current ratio in the Portland metropolitan area, and that the UGB was not "based on the adopted 20-year population forecast" because that population would not yield the jobs and employment land claimed to be needed.

The director denied petitioner's objection:

"This objection contends the employment forecast in the EOA is inconsistent with the city's adopted population forecast because the rates of increase are considerably different and the resulting jobs-per-resident ratio is uncommonly high. The objector contends this violates OAR 660-0024-0040(1) and Goal 2. As previously indicated, the city does not use the employment forecast as a sole determinant of need. As made clear in OAR 660-024-0040(5), proportionality is not required. The record includes an explanation of why the two forecasts are not parallel. Record at 359-362. The department finds this analysis adequate in light of not holding the city to an unreasonably high expectation

regarding precision when the employment forecast wasn't the sole basis for determining land need."

(Footnotes omitted.) Petitioner argued to LCDC that "the justification for the divergence of the employment forecast from the adopted population forecast for Scappoose is very thin and lacks credibility while at the same time the divergence between the employment and jobs forecast is very large, requiring an especially clear and credible explanation."

LCDC concluded that proportionality between population and job growth forecasts is not required by OAR 660-024-0040(5), and that

"[t]he city has documented the reasons why the population and economic forecasts are not parallel. Record at 359-363.[8] In addition to the rationale described in the response to Objections 2 through 4 above [projecting a high employment growth rate for the city because jobs will be filled by persons who reside in the Portland metropolitan area and the city will continue to experience a high employment growth rate based on past history, and that property will develop because of expansion of the Scappoose Airpark and because the Portland metropolitan area lacks comparable industrial land sites], the record demonstrates that employment in the city is tied to the Portland metropolitan region as much as it is to Columbia County, and that the EOA has taken account of the multiplier effect that employment in certain industries has regarding additional employment creation."

In her second assignment of error, petitioner reiterates her argument made to the director and LCDC, contending that the discrepancy between the city's adopted job-per-resident ratio for 2030 and the historic ratio in the city required a stronger justification than was provided by the city in the EOA. Petitioner does not contend that the

---

[8] The record cite refers to a March 1, 2011, letter from the city's planning consultant to the city. The letter examines the commuting patterns of workers in Scappoose and Columbia County, and concludes that most Scappoose workers commute to jobs outside Columbia County, and that the EOA projects that this will change because of a "transition of Scappoose from functioning as a bedroom community to a more self-sufficient employment center, providing jobs for local residents and the surrounding area." The letter also explains how the increased employment projection is largely tied to job increases in aviation manufacturing and the likely multiplier effect of that job increase on related employment.

rationale provided by the city, and accepted by LCDC, was legally defective under OAR 660-024-0040(1); that is, she does not assert that, as a matter of law, the city could not project that most of its future residents would be employed locally or that job growth for city residents and nonresidents could not be pegged to uses connected to the airport and related uses. Those considerations are plainly relevant to the projected job growth. We conclude that petitioner is concerned with the persuasiveness of the city's rationale. That determination is one for the city to make. LCDC correctly concluded that the city's justification was consistent with the applicable goals and rules.[9]

## V.  CONCLUSION

We conclude that the LCDC order is not "unlawful in substance." Based on LCDC's correct articulation of its own substantial evidence standard of review and the manner in which it applied that standard, we conclude that LCDC properly understood its substantial evidence standard of review. We also conclude, applying the rule of deference noted earlier, that LCDC correctly applied the statewide planning goals and its rules implementing those goals to the city's UGB amendment decision. Finally, we conclude that LCDC adequately explained its determination of petitioner's objections sufficiently to allow us to examine its order for legal sufficiency.

Affirmed.

---

[9] As noted, we reject without further discussion petitioner's substantial evidence challenges to the city's findings on projected employment in residential areas (third assignment of error), need for additional land for an airport runway and hangar expansion (fourth assignment of error), and the development potential for a parcel not included in the city's inventory of industrial land (fifth assignment of error).